UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH S. SWYCAFFER,<br><br>　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>　　　　　　　　　　　Defendant. | No.: 19-CV-1526-TWR(WVG)<br><br>**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

This is an action for judicial review of a decision by the Commissioner of Social Security, Andrew Saul ("the Commissioner," or "Defendant"), denying Plaintiff Joseph Swycaffer continuing Social Security Disability Insurance benefits under Title II of the Social Security Act (the "Act"). The parties have filed cross-motions for summary judgment, and the matter is before the undersigned Magistrate Judge for preparation of a Report and Recommendation. For the reasons stated below, the Court RECOMMENDS that Plaintiff's motion for summary judgment be DENIED and Defendant's cross-motion for summary judgment be GRANTED.

## I. OVERVIEW OF SOCIAL SECURITY CLAIM PROCEEDINGS

Pursuant to the Social Security Act, the Social Security Administration ("SSA") administers the SSI program. 42 U.S.C. § 901. The Act authorizes the SSA to create a

system by which it determines who is entitled to benefits and by which unsuccessful claimants may obtain review of adverse determinations. *Id.* §§ 423 *et seq.* Defendant, as Commissioner of the SSA, is responsible for the Act's administration. *Id.* § 902(a)(4), (b)(4).

## A. The SSA's Sequential Five-Step Process for Disability Under the Act

Pursuant to the Social Security Act, claimants who are 18 years old or older and whose disability began before attaining age 22 are eligible to receive disabled child's insurance benefits. 20 C.F.R. § 404.350(a)(5). "Disability" is defined in the Act as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d), 20 C.F.R. § 404.1505.

The SSA employs a sequential five-step evaluation process to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920.

At step one, the ALJ considers whether the claimant is currently engaging in substantial gainful activity. *Id.* A claimant is considered to be performing substantial gainful activity when engaged in substantial work activity that is usually done for pay or profit. 20 C.F.R. §§ 404.1572, 416.972. If the claimant is currently engaged in substantial gainful activity, the claimant is not disabled. *Id.* If the claimant is not currently engaging in substantial gainful activity, the analysis proceeds to the next step.

At step two, the ALJ must determine whether the claimant has a "severe" medically determinable impairment or combination of impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe" impairment under the Act is a medically determinable impairment which significantly limits an individual's ability to perform basic work activities. 20 C.F.R. §§ 404.1522, 416.922. If the claimant does not have a "severe" impairment or combination of impairments, the claimant is not disabled. *Id*. If one or more of the claimant's impairments are "severe," the analysis proceeds to the next step.

At step three, the ALJ must determine whether the claimant's impairment or combination of impairments meet the requisite level of severity listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the claimant's impairments are of a medically equal or greater degree of severity than the listed criteria, the claimant is disabled. *Id*. If the claimant's impairments do not meet the listed requirements, the analysis proceeds to the next step.

Prior to step four, the ALJ must determine the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(f), 416.920(f). A claimant's residual functional capacity is defined as their ability to perform physical and mental work activities on a sustained basis while taking into account all of the claimant's impairments, including non-severe impairments. 20 C.F.R. §§ 404.1520(e), 404.1545.

At step four, the ALJ considers whether the claimant has the residual functional capacity to engage in any of their past, relevant work. 20 C.F.R. § 404.1520(f). Past relevant work is defined as work the claimant has actually performed within the last fifteen years, where the claimant was substantially gainfully employed and employed long enough to learn the job. 20 C.F.R. § 404.1560(b)(1). If the claimant has the residual functional capacity to engage in any of their past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(f). If the claimant cannot perform any of their past work or has no past relevant work, the analysis proceeds to the final step.

At the final step, the ALJ considers whether the claimant is able to perform any other work considering the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g). At this stage, the burden of proof shifts from the claimant to the SSA to show that any work claimant can purportedly engage in exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1512(b)(3), 404.1560(c). If the claimant is not able to perform any other work, the claimant is disabled. C.F.R. § 404.1520(g). If the claimant is able to engage in other work, the claimant is not disabled. *Id.*

**B.     SSA Hearings and Appeals Process**

In accordance with Defendant's delegation, the Office of Disability Adjudication and Review administers a nationwide hearings and appeals program. SSA regulations provide for a four-step process for administrative review of a claimant's application for disability payments. *See id.* §§ 416.1400, 404.900. Once the SSA makes an initial determination, three more levels of appeal exist: (1) reconsideration, (2) hearing by an ALJ, and (3) review by the Appeals Council. *See id.* §§ 416.1400, 404.900. If the claimant is not satisfied with the decision at any step of the process, the claimant has sixty days to seek administrative review. *See id.* §§ 404.933, 416.1433. If the claimant does not request review, the decision becomes the SSA's—and hence Defendant's—binding and final decree. *See id.* §§ 404.905, 416.1405.

A network of SSA field offices and state disability determination services initially process applications for disability benefits. The processing begins when a claimant completes both an application and an adult disability report and submits those documents to one of the SSA's field offices. If the SSA denies the claim, the claimant is entitled to a hearing before an ALJ in the SSA's Office of Disability Adjudication and Review. *Id.* §§ 404.929, 416.1429. A hearing before an ALJ is informal and non-adversarial. *Id.* § 404.900(b).

If the claimant receives an unfavorable decision by an ALJ, the claimant may request review by the Appeals Council. *Id.* §§ 404.967, 416.1467. The Appeals Council will grant, deny, dismiss, or remand a claimant's request. *Id.* §§ 416.1479, 404.979. If a claimant disagrees with the Appeals Council's decision or the Appeals Council declines to review the claim, the claimant may seek judicial review in a federal district court. *See id.* §§ 404.981, 416.1481. If a district court remands the claim, the claim is sent to the Appeals Council, which may either make a decision or refer the matter to another ALJ. *Id.* § 404.983.

/ / /

/ / /

## II. BACKGROUND

### A. Procedural History

Plaintiff is a 26-year-old male who alleges he continues to be too disabled to work. (AR 61.) On May 26, 2016, Plaintiff filed an application for child's Disability Insurance Benefits as well as supplemental security income pursuant to Title II of the Act. (AR 62.) In each application, Plaintiff alleged his disability began on January 1, 2011. (AR 61.) Each claim was denied on August 4, 2016. (AR 87-88.) Plaintiff filed a request for reconsideration on September 23, 2018. (AR 126.) The request for reconsideration was denied on November 2, 2016. (AR 118.) On November 17, 2017, Plaintiff requested a hearing before an ALJ. (AR 137.) The hearing occurred on May 8, 2018. (AR 31.) The ALJ issued an unfavorable decision on September 27, 2018. (AR 12.) Plaintiff thereafter filed a request for review of the ALJ's unfavorable decision to the Social Security Appeals Council, which was denied on June 13, 2019. (AR 1.) On January 4, 2020, Plaintiff filed the Complaint in the instant case seeking review of the ALJ's decision.

### B. Plaintiff's Testimony

Plaintiff testified at the hearing before the ALJ that he suffers from "anxiety attacks" that prevent him from working. (AR 41.) He testified his anxiety attacks lasted "two to four hours" and would occur "5 or 10 times a week or more." (*Id.*) Plaintiff also testified he has an imaginary friend, "Lasayis," who prevents him from working by contacting him while he works. (AR 42-43.) Plaintiff reported he spends "30 minutes to an hour" speaking to "Lasayis" "almost every day." (AR 48-49.) Plaintiff claimed "Lasayis" gives him instructions which he feels compelled to write down. (AR 50). Plaintiff also testified he had sent letters to various government officials (*Id.*)

Plaintiff testified that when he experiences anxiety attacks, "sometimes the medication works, and sometimes it doesn't." (AR 41.) He reported side effects from the medication which he described as "panicking" and claimed it caused him to be hospitalized. (AR 54.) Plaintiff also claimed he needed reminders to "tend to everyday

tasks" and that he often stops what he is doing to "write down what 'Lasayis' is telling [him]." (AR 51-54.)

Additionally, Plaintiff claimed he visits church and the park with his roommate. (AR 43.) Plaintiff stated he visits church three to four times per week "for prayers" with approximately thirty to sixty other people. (AR 43-44.) He also reported helping his roommate with household chores such as cleaning and laundry for "thirty minutes to an hour" "once or twice a week." (AR 44-45.)

## C. Plaintiff's Medical History

Plaintiff's early educational records reveal he experienced difficulties that led to family therapy, psychological counseling, and poor grades during middle and high school. (*See, e.g.*, AR 356-72, 381.) At age 16, Plaintiff's father presented him to San Diego County Mental Health Services because Plaintiff was delusional and threatening his family. (AR 551.) Based on the assessment, Plaintiff was that same day transported to UC San Diego hospital for further psychological treatment. (AR 566.) Plaintiff was hospitalized for "about [seven] days" for psychological treatment. (AR 587.) Upon discharge, Plaintiff failed to follow through with his outpatient treatment and prescribed medication. (*Id.*)

Six years later, on August 28, 2016, Plaintiff was again admitted to UC San Diego hospital for psychological treatment after reporting delusions and paranoia. (AR 764.) Plaintiff was given Olanzapine and reported his symptoms improved. (AR 772-76.) Plaintiff was transferred to Bay View Hospital and discharged on September 1, 2016. (AR 777.)

On September 7, 2016, Plaintiff first contacted his treating physician, Dr. Bunner, at San Diego County Mental Health Services North Central Clinic. (AR 708.) At this time Plaintiff reported paranoia and religious delusions and was prescribed Abilify. (AR 708.) Dr. Bunner provided individual progress notes on each appointment with Plaintiff between September 2016 and March 2018. (*See* AR 708-756.)

On September 14, 2016, Plaintiff denied paranoia or depression since starting Abilify. (AR 709.) On September 22, 2016, Plaintiff reported some paranoid symptoms

and claimed Abilify was making him "restless." (AR 711-12.) Dr. Bunner reduced Plaintiff's dosage of Abilify and prescribed Quetiapine. (AR 712.)

On September 23, 2016, Plaintiff was again admitted to UC San Diego after reporting paranoid delusions. (AR 572.) Plaintiff was given several medications and was discharged the following morning, feeling "great," with mild, redirectable preoccupation. (AR 573.) However, on September 29, 2016, Plaintiff was again brought to the hospital in a manic state. (AR 578.) His symptoms abated after medication was brought back to therapeutic levels, and Plaintiff was again discharged the following morning feeling "much better." (AR 579-80.)

Following this period of hospitalization, he returned to regular appointments with Dr. Bunner. On October 3, 2016, Dr. Bunner adjusted Plaintiff's medication dosage after Plaintiff denied any paranoia yet reported nausea from his medication. (AR 715-16.) One week later, Plaintiff reported an excellent mental status, good response to medication, and no paranoia or delusions. (AR 717.) On November 7, 2016, Plaintiff reported feeling sedated during the day and Dr. Bunner reduced Plaintiff's Depakote dose. (AR 722.) Plaintiff continued to report positive response to medication from December 2016 to February 2017 despite some unfocused thoughts. (AR 723-27.) On March 23, 2017, Plaintiff complained of disorganized thoughts and sedation. (AR 729-30.) Dr. Bunner switched Plaintiff's medication to Ziprasidone 80mg. (*Id.*) Plaintiff was instructed to increase his dosage to 160mg after one week but declined to do so because it caused him trouble sleeping. (AR 733.) On May 19, 2017, Plaintiff reported experiencing anxiety and paranoia, which Dr. Bunner attributed to Plaintiff's daily marijuana use. (AR 736.) Dr. Bunner's reports from September 2017 through March 2018 show Dr. Brunner continued to adjust Plaintiff's medication, and Plaintiff responded generally well to medication with no delusions despite some depression and anxiety. (*See* AR 739, 741, 744-50.)

On August 4, 2016, Dr. Nick Rios performed an Initial Disability Determination wherein he diagnosed Plaintiff with bipolar disorder, attention deficit-hyperactivity disorder, and depression. (AR 67.) Dr. Rios noted Plaintiff had a history of family trauma,

psychiatric treatment, and substance abuse. (AR 70-71.) Dr. Rios further noted that Plaintiff suffered limitations in the areas of understanding and memory, sustained concentration and persistence, social interaction, and ability to adapt. (AR 68.) However, Dr. Rios opined that the objective medical record indicated Plaintiff retained the capacity to work where social interaction is limited and incidental. (AR 71.) Dr. Rios opined Plaintiff would be able to perform unskilled labor involving simple tasks with few variables, little judgment, and concrete supervision. (*Id.*)

On November 2, 2016, Dr. Gina Rivera-Maya performed a Reconsideration Disability Determination in which she reviewed Plaintiff's file. (AR 90.) During Dr. Rivera-Maya's review, she assessed whether there had been any change in Plaintiff's medical condition since the initial review. (*Id.*) Dr. Rivera-Maya noted Plaintiff was recently hospitalized for psychological treatment and was experiencing delusions and outbursts. (AR 94.) However, Dr. Rivera-Maya found that substance abuse was a material factor in Plaintiff's delusions as Plaintiff never tested negative for marijuana while experiencing delusions. (AR 95.) Dr. Rivera-Maya opined that without substance abuse, Plaintiff would be able to sustain unskilled labor for forty hours per week with limited public contact. (*Id.*)

**E.    ALJ's Findings**

At step one of the five-step sequential evaluation process described above, the ALJ found Plaintiff had not engaged in substantial gainful activity since January 1, 2011. (AR 18.)

At step two, the ALJ found that Plaintiff had the following severe impairments: depression, anxiety, schizoaffective disorder, and post-traumatic stress disorder. (*Id.*)

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

///
///

Prior to step four, the ALJ determined that Plaintiff had the residual functional capacity to perform work at all exertional levels, with the following non-exertional limitations.

> [Plaintiff] is limited to understanding, remembering, and carrying out simple, routine, repetitive tasks, with standard industry work breaks every two hours, to no interactions with the general public, and to occasional work-related, non-personal, non-social interactions with co-workers and supervisors involving no more than a brief exchange of information or hand-off of product.

(AR 19-20.) At step four, the ALJ found Plaintiff had no past relevant work. (AR 23.)

At step five, the ALJ determined that there are jobs in significant numbers in the national economy that Plaintiff is able to perform. (*Id.*) In making his assessment, the ALJ considered Plaintiff's age, education, work experience, and residual functional capacity. (*Id.*)

### III. STANDARD OF REVIEW

A district court will not disturb the Commissioner's decision unless it is based on legal error or not supported by substantial evidence. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). Substantial evidence is such relevant evidence, based on the record as a whole, as a reasonable mind might accept as adequate to support a conclusion. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high.'" *Biestek*, 139 S. Ct. at 1154. "Substantial evidence, [the Supreme] Court has said, is 'more than a mere scintilla.' It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). Whether the Commissioner's decision is supported by substantial evidence "is a highly deferential standard of review." *Valentine v. Comm'r of SSA*, 574 F.3d 685, 690 (9th Cir. 2009).

### IV. DISCUSSION

Plaintiff argues that the ALJ lacks sufficient evidentiary support to justify discounting the Plaintiff's subjective testimony and the treating physician's opinions. Defendant contends that the ALJ acted reasonably and provided specific and legitimate

reasons to justify discounting the Plaintiff's subjective testimony and the treating physician's opinions. This Court agrees with Defendant.

### A. Substantial Evidence Supports the ALJ's Evaluation of the Medical Opinion Evidence

When evaluating applications filed before March 27, 2017, the ALJ must evaluate all medical opinions, and articulate reasons for the weight given to the medical source opinions. 20 C.F.R § 416.927(c)(2). As a general rule, more weight is given to the opinion of the treating sources than to the opinions who did not treat the claimant. *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995). If a treating source opinion is both "well supported by medically acceptable clinical and laboratory techniques" and is "not inconsistent with other substantial evidence in the case record," that opinion is given "controlling weight." 20 C.F.R § 416.927(c)(2). However, unless controlling weight is assigned to the treating source opinion, the ALJ is required to consider the factors set out in 20 C.F.R. § 404.1527(c)(2)-(6) in determining how much weight to afford any medical opinion.

These factors include: (1) the length of the treatment relationship and the frequency of examination by the treating physician; (2) the nature and extent of the treatment relationship between the patient and the treating physician; (3) the supportability of the physician's opinion with medical evidence; (4) the consistency of the physician's opinion with the record as a whole; (5) the specialization of the medical source opinion; and (6) other factors raised by the parties. *Id*. Further, in cases where a treating doctor's opinion is contradicted by another doctor's opinion, the ALJ may reject or assign little weight to the treating doctor's opinion only by providing "specific and legitimate reasons that are supported by substantial evidence." *Garrison v. Colvin*, 759 F.3d, 995, 1012 (9th Cir. 2007). The ALJ satisfies the substantial evidence requirement by "setting out a detailed and thorough summary of facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.*

Here, the ALJ declined to assign controlling weight to Dr. Bunner's opinion concerning the frequency and severity of Plaintiff's condition after finding the opinion was

not consistent with the objective medical evidence in the record as a whole. Instead, the ALJ assigned little weight to Dr. Bunner's opinion after considering the frequency of treatment and the supportability and consistency of Dr. Bunner's medical opinion with the objective evidence of record. In his assessment of weight, the ALJ considered Dr. Bunner's opinion that Plaintiff experienced marked limitations in most areas and would be off task for more than 20% of the day. (AR 22, 544-48.) The ALJ cited specific evidence for determining that Dr. Bunner's medical opinion is inconsistent with the objective evidence of record. (AR 22.) The ALJ identified numerous mental status examinations which show Plaintiff to be "generally unremarkable." (*See, e.g.*, AR 21, 682, 696, 765.)

Based on the Court's review of the objective medical record, the ALJ's assessment is supported by substantial evidence. Throughout Plaintiff's period of treatment with Dr. Bunner, Plaintiff's medications were adjusted numerous times and Plaintiff experienced periods of both improvement and decompensation in his condition. (*See* AR 698-750.) Plaintiff first visited Dr. Bunner in September 2016. (AR 708.) Plaintiff reported paranoia and religious delusions and was prescribed Abilify. (*Id.*) Just one week later, Plaintiff denied experiencing any paranoid delusions. (AR 709.) However, in the subsequent weeks, his condition decompensated, and he was hospitalized twice and released upon improvement in his condition. (AR 572-74, 578.) During his first appointment with Dr. Bunner following hospitalization, Plaintiff claimed he had only taken Quetiapine "for a day" before being hospitalized. (AR 715.) On October 3, 2016, Dr. Bunner again adjusted Plaintiff's medication, and on October 10, Plaintiff reported significant improvement, no paranoia or delusions, and more organized thought processes. (AR 715-17.) Plaintiff also stated he was seeking to return to work at that time. (AR 717.)

From October 2016 until January 2017, Plaintiff continued to report generally improved conditions despite occasional depression, anxiety, and disorganized thoughts. (AR 719-25.) He consistently reported no hallucinations or paranoia despite some anxiety and "delusional thinking." (*Id.*) On February 22, 2017, Plaintiff reported experiencing heart palpitations and anxiety, which Dr. Bunner attributed to Plaintiff's temporary cessation of

marijuana while he sought employment. (AR 727.) On March 22, 2017, Plaintiff complained of "disorganized thoughts and sedation" and Dr. Bunner again adjusted Plaintiff's mix of medications. (AR 729.) However, Plaintiff failed to comply with Dr. Bunner's recommendation that Plaintiff increase the dosage of his new medication, Ziprasidone, from 80mg to 160mg after one week of use. (AR 731.) Despite this, Plaintiff reported an improved mental condition, with no hallucinations, delusions, or paranoia. (*Id.*)

From May 2017 until the final record from Dr. Bunner in March 2018, Plaintiff continued to report occasional depression, paranoia, and audio hallucinations. (AR 733-50.) During this time, Dr. Bunner continually adjusted Plaintiff's mix of medications to reduce side effects. (*Id.*) The record shows Plaintiff continued to use marijuana despite Dr. Bunner's instructions to quit. (AR 736, 738, 741). Additionally, Plaintiff was continually seeking employment during this period. (AR 739, 746.)

The Court's review of the above medical history indicates that the ALJ properly discounted Dr. Bunner's opinion that Plaintiff would be off task for 20% or more of the day. The Court notes that Plaintiff's condition markedly improved when he complied with his physician's treatment recommendations. (AR 709, 717, 719.) Although Plaintiff was hospitalized in a manic state, on each occasion his condition rapidly improved after receiving a dose of medication. (AR 577, 578, 772.) Following Plaintiff's final discharge from the hospital, he had a positive mental status exam and "excellent" prognosis, denying paranoia, delusions, or side effects from medication. (AR 580, 717.)

However, Plaintiff thereafter repeatedly failed to comply with Dr. Bunner's treatment recommendations. Plaintiff stated he had taken his prescribed Quetiapine only "for a day" before going to the hospital. (AR 715.) On April 18, 2017, Plaintiff failed to increase his dose of Ziprasidone from 80mg per day to 160mg per day as instructed by Dr. Bunner. (AR 733.) On January 6, 2018, Plaintiff stated he had stopped taking his prescribed antidepressant Sertraline after two days because it made him sleepy. (AR 750.)

Further, Dr. Bunner repeatedly instructed Plaintiff to cease using marijuana—yet Plaintiff refused. (*See, e.g.*, AR 736, 738, 741.) The record reflects that on numerous

occasions Dr. Bunner attributed Plaintiff's symptoms of anxiety and paranoia to his marijuana use. For example, on May 19, 2017, Dr. Bunner noted that he "again recommended [Plaintiff] stop marijuana to reduce paranoia." (AR 736). And on July 14, 2017, Dr. Bunner opined Plaintiff "has remained paranoid even with [treatment,] but uses marijuana daily and declines to stop." (AR 738.)

The Court notes that although Plaintiff failed to fully comply with his physician's recommendations, the record reveals he was feeling well enough to apply for work. As early as October 10, 2016—just ten days after being released from the hospital—Plaintiff reported a desire to go back to work soon. (AR 717.) On July 18, 2017, Plaintiff was applying for jobs and stated he was "working at the Swapmeet with his friend." (AR 739.) On November 1, 2017, Dr. Bunner noted Plaintiff was considering using Employment Services to assist him in finding a job and that Plaintiff "works some part time with his roommate on the weekends." (AR 746.)

Ultimately, the ALJ acted reasonably in assigning little weight to Dr. Bunner's opinion due to its lack of support or consistency with the record as a whole. (AR 22.) The ALJ provided substantial evidence to support his claim that, although Plaintiff experiences some limitations due to his condition, Plaintiff's limitations are not greater than delineated in his residual functional capacity. (AR 21.) The Court's review of the medical record confirms that Plaintiff's mental status is "generally moderate" when Plaintiff is compliant with his physician's treatment recommendations. (AR 22.) Although Plaintiff experienced periods of decompensation in his condition, Plaintiff remained well enough to apply for work during those periods. (*See, e.g.*, AR 717, 739, 746.) Accordingly, the ALJ properly weighed the medical opinion evidence concerning the frequency and severity of Plaintiff's condition and provided specific and legitimate reasons for assigning little weight and discounting Dr. Bunner's medical opinion. (AR 22.) Because the ALJ's evaluation of the medical opinion evidence was supported by substantial evidence, the Court should affirm the ALJ's decision by granting Defendant's motion for summary judgment.

## B. The ALJ Properly Discounted Plaintiff's Subjective Symptom Testimony

A claimant's subjective symptoms are a proper consideration in a disability evaluation, but those statements alone cannot be decisive on a disability claim. 20 C.F.R. § 404.1529(a); *Smolen v. Chater*, 80 F.3d 1273, 1291 (9th Cir. 1996). In deciding whether to credit a claimant's testimony about subjective symptoms or limitations, an ALJ must engage in a two-step analysis. *Smolen*, 80 F.3d at 1281. Under the first step, the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce pain or other symptoms. *Id.* If this step is satisfied, and there is no affirmative evidence that the claimant is malingering, then the ALJ must determine the credibility of the claimant's subjective complaints and "evaluate the intensity and persistence of [the] symptoms" to determine whether and how these symptoms limit a claimant's ability to work. *See* 20 C.F.R. § 404.1529(c)(1). The ALJ may reject the claimant's testimony about the severity of symptoms as long as he gives clear, specific, and convincing reasons for doing so. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). In weighing a claimant's credibility, the ALJ may consider the following factors: (1) reputation for being honest, (2) inconsistencies in the claimant's testimony, (3) inconsistencies in the claimant's conduct, (4) daily living activities, (5) work record, and (6) physician's testimony concerning the symptoms alleged. *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002) (quoting *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

Here, the ALJ declined to fully credit Plaintiff's subjective symptom testimony concerning his mental health limitations due to its inconsistency with the evidence of record. The ALJ made specific findings discounting Plaintiff's testimony when compared to the objective evidence of record. In his assessment of weight, the ALJ considered Plaintiff's contention that Plaintiff's medical record is replete with abnormal mental status examinations. (*See, e.g.*, AR 432, 477, 558, 682.) The ALJ acknowledged Plaintiff suffered from mental health impairments and had some limitations due to these impairments. (AR

20.) However, the ALJ determined that Plaintiff's statements concerning the intensity of his limitations were not reflected by the objective medical record. (*Id.*)

The ALJ acknowledged that Plaintiff had been hospitalized in August and September of 2016 due to his "manic state and schizophrenia issues." (AR 21). However, the ALJ reasoned that Plaintiff's hospitalization was an acute event in context of Plaintiff's entire medical record and did not establish an ongoing or normative level of functioning (*Id.*) The ALJ noted that during hospitalization, Plaintiff's condition "recompensated quickly with substantial improvement" when medication was "titrated up in the therapeutic range." (AR 21, 529.) The ALJ cited several notes from the latter days of Plaintiff's hospital records which note Plaintiff having much improved cognitive function. (AR 21, 537, 572, 580.) The ALJ specifically identified Plaintiff's clinical prognosis report from September 29, 2016 which states that upon discharge from the hospital Plaintiff was "stable on medication" and his prognosis was "excellent." (AR 21, 580.) Plaintiff had no auditory hallucinations, visual hallucinations, or paranoia despite remaining somewhat grandiose at this time. (AR 21, 579.)

The ALJ additionally referenced treatment records *prior to* Plaintiff's hospitalization which showed Plaintiff experienced only mild social symptoms (AR 21, 356.) The ALJ therefore reasoned that Plaintiff's acute periods of hospitalization were not reflective of his normal level of mental functioning. (AR 21.)

Additionally, the ALJ considered Plaintiff's subjective reports of depression and anxiety following his hospitalization. (AR 21.) The ALJ determined that although Plaintiff may experience some limitations based on these conditions, his testimony regarding the extent of his limitations was not consistent with the objective medical record. (*Id.*) The ALJ utilized Plaintiff's reports that his medications were helping him cope with his conditions. (AR 21, 585). The ALJ pointed to numerous mental examinations in which Plaintiff reported medications helped abate his depression and anxiety. (*See, e.g.*, AR 21, 585, 731.) Specifically, the ALJ identified a behavioral health assessment dated October 3, 2017 in which Plaintiff claimed medications had been "very helpful." (AR 585.)

1  Additionally, the ALJ noted that Plaintiff was feeling well enough to search for
2  employment at this time. (*Id.*) The ALJ noted an additional record dated April 5, 2017 in
3  which Plaintiff stated he was tolerating medication and was applying for jobs. (AR 731.)

4  Furthermore, the ALJ reasoned that Plaintiff only experiences mild social symptoms
5  based on his regular daily activities. (AR 21.) The record indicates that in September and
6  October of 2017 Plaintiff reported feeling well enough to seek employment. (AR 21, 585,
7  731.) The ALJ noted Plaintiff frequently engaged in activities such as visiting a local park
8  and church with his roommate. (AR 247.) Plaintiff further reported playing online video
9  games and attempting to sell things on the internet. (AR 247, 731-33.) The ALJ also
10 identified that on April 5, 2017, Plaintiff was not living with a "caregiver" but a friend, and
11 this friend reported he was "less sedated" and "more active" on the current medication.
12 (AR 731.)

13 Based on the Court's review of the medical record, the ALJ reasonably determined
14 that the Plaintiff's medically determinable impairments are not entirely consistent with
15 Plaintiff's statements concerning the intensity, persistence, and limiting effects of these
16 symptoms. (AR 20.) The ALJ identified specific evidence to support his finding that
17 although Plaintiff experienced some limitations based on his affirmative diagnoses, he was
18 functioning well enough to apply for jobs and did not experience limitations beyond his
19 residual functional capacity. (AR 21.) The ALJ gave specific reasons for finding Plaintiff's
20 periods of hospitalization did not represent a normative, ongoing level of functioning which
21 were supported by the objective medical record. (AR 21.) Although Plaintiff experiences
22 some limitations based on his affirmative diagnoses of anxiety, depression, schizoaffective
23 disorder, and PTSD, the ALJ provided substantial evidence to find that Plaintiff's claims
24 regarding the intensity of his conditions were not reflected by the objective medical record.
25 (*Id.*) Accordingly, the ALJ properly discounted Plaintiff's subjective symptom testimony
26 as inconsistent with the objective medical record.

**C.     Plaintiff is Not Entitled to Summary Judgment**

Based on the foregoing recommendation that Defendant's Cross-MSJ be GRANTED, this Court necessarily recommends that Plaintiff's MSJ be DENIED.

## V.     CONCLUSION

This Court RECOMMENDS that Plaintiff's MSJ be DENIED and that Defendant's Cross-MSJ be GRANTED.

This Report and Recommendation is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).

IT IS ORDERED that **no later than December 21, 2020**, any party to this action may file written objections with the Court and serve a copy on all parties. The document shall be captioned "Objections to Report and Recommendation."

IT IS FURTHER ORDERED that any reply to the objections shall be filed with the Court and served on all parties **no later than January 20, 2021**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: November 18, 2020

_____
Hon. William V. Gallo
United States Magistrate Judge